1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LUIS MANUEL GARCES,                    Case No.  1:21-cv-00392-EPG (PC)

12              Plaintiff,                   FINDINGS AND RECOMMENDATIONS
                                            RECOMMENDING THAT THIS ACTION
13        v.                                PROCEED ON PLAINTIFF'S CLAIMS
                                            AGAINST DEFENDANTS HERNANDEZ,
14   M. GAMBOA, et al.,                      HUBBARD, HUERTA, CATHEY, WOLF,
                                            AND ALLISON FOR EXCESSIVE FORCE IN
15              Defendants.                  VIOLATION OF THE EIGHTH
                                            AMENDMENT AND AGAINST
16                                          DEFENDANTS HERNANDEZ, HUBBARD,
                                            RAVIJOT, IBARRA, CAMACHO, ARGON,
17                                          RAMADAN, AND BOYD FOR
                                            DELIBERATE INDIFFERENCE TO
18                                          SERIOUS MEDICAL NEEDS IN
                                            VIOLATION OF THE EIGHTH
19                                          AMENDMENT AND THAT ALL OTHER
                                            CLAIMS AND DEFENDANTS BE
20                                          DISMISSED

21                                          (ECF No. 15)

22                                          OBJECTIONS, IF ANY, DUE WITHIN
                                            TWENTY-ONE DAYS
23
                                            ORDER DIRECTING CLERK TO ASSIGN A
24                                          DISTRICT JUDDGE

25

26        Plaintiff Luis Manuel Garces ("Plaintiff") is a state inmate proceeding *pro se* and *in forma*

27   *pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983.

28   ///

                                            1

## I.      BACKGROUND

Plaintiff filed the Complaint commencing this action on March 12, 2021. (ECF No. 1.) On April 21, 2021, Plaintiff filed a First Amended Complaint ("FAC"). (ECF No. 11.) The FAC brought claims against fifteen prison officials concerning the force used against Plaintiff during an incident on June 12, 2019, and his subsequent medical treatment. (*Id.*)

On May 7, 2021, the Court entered a screening order finding that the FAC stated claims against Defendants V. Cathey, D. Hernandez, J. Hubbard, M. Huerta, and T. Wolf for excessive force in violation of the Eighth Amendment and Defendants Argon Lorena, Boyd Bonnie, Cathey, Camacho Emilia, Hernandez, Hubbard, Huerta, Ibarra Jaime, Ramadan Amir, Gill Rajivot, and Wolf for deliberate indifference to serious medical needs in violation of the Eighth Amendment. (ECF No. 12.) The Court found that the FAC failed to state any other claims. (*Id.*) The Court gave Plaintiff thirty days to either "a. File a Second Amended Complaint; b. Notify the Court in writing that he wishes to proceed only on the claims against Defendants Cathey, Hernandez, Hubbard, Huerta, and Wolf for excessive force in violation of the Eighth Amendment and Defendants Argon, Boyd, Cathey, Camacho, Hernandez, Hubbard, Huerta, Ibarra, Ramadan, Rajivot, and Wolf for deliberate indifference to serious medical needs, in violation of the Eighth Amendment; or c. Notify the Court in writing that he wants to stand on this complaint." (*Id.* at 18.) On June 14, 2021, Plaintiff filed a Second Amended Complaint ("SAC"), which is now before the Court for screening.

For the reasons that follow, the Court will recommend that this action proceed on Plaintiff's claims against Defendants Hernandez, Hubbard, Huerta, Cathey, Wolf, and Allison for excessive force in violation of the Eighth Amendment and against Defendants Hernandez, Hubbard, Ravijot, Ibarra, Camacho, Argon, Ramadan, and Boyd for deliberate indifference to serious medical needs in violation of the Eighth Amendment. The Court will also recommend that all other claims and defendants be dismissed for failure to state a claim upon which relief may be granted.

Plaintiff has twenty-one days from the date of service of these findings and recommendations to file his objections.

1    **I.    SCREENING REQUIREMENT**

2    The Court is required to screen complaints brought by inmates seeking relief against a

3    governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The

4    Court must dismiss a complaint or portion thereof if the inmate has raised claims that are legally

5    "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek

6    monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

7    As Plaintiff is proceeding *in forma pauperis*, the Court may also screen the complaint under 28

8    U.S.C. § 1915. "Notwithstanding any filing fee, or any portion thereof, that may have been paid,

9    the court shall dismiss the case at any time if the court determines that the action or appeal fails to

10   state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

11   A complaint is required to contain "a short and plain statement of the claim showing that

12   the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not

13   required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

14   conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell*

15   *Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must set forth "sufficient factual

16   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting

17   *Twombly*, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this

18   plausibility standard. *Id.* at 679. While a plaintiff's allegations are taken as true, courts "are not

19   required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc*., 572 F.3d 677, 681

20   (9th Cir. 2009) (citation and quotation marks omitted). Additionally, a plaintiff's legal

21   conclusions are not accepted as true. *Iqbal*, 556 U.S. at 678.

22   Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal

23   pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (holding that

24   pro se complaints should continue to be liberally construed after *Iqbal*).

25   **II.    ALLEGATIONS IN THE SECOND AMENDED COMPLAINT**

26   The SAC names seventeen individuals as defendants: M. Gamboa, Warden at California

27   State Prison--Corcoran ("CSP-Corcoran"); Kern Klark, Chief Warden at CSP-Corcoran; D.

28   Hernandez, Sergeant and CSP-Corcoran; T. Sanders, Lieutenant at CSP-Corcoran; Babb, 3B Yard

Captain at CSP Corcoran; J. Hubbard, 3B Yard Sergeant at CSP-Corcoran; M. Huerta, Correctional Officer at CSP-Corcoran; V. Cathey, Correctional Officer at CSP-Corcoran; T. Wolf, Correctional Officer at CSP-Corcoran; Kathleen Allison, Board Director at Sacramento CDCR; Gill Ravijot, Doctor at CSP-Corcoran T.T.A.; Ibarra Jaime, Nurse at CSP-Corcoran T.T.A.; Camacho Emilia, Nurse at CSP-Corcoran 3-B Yard clinic; Argon Lorena, Nurse at CSP-Corcoran 3-B Yard clinic; Ramadan Amr., Doctor at CSP-Corcoran; Gallagher; and Boyd Donne, Regular Nurse at CSP-Corcoran 3-B Yard clinic. The SAC alleges the following facts:[1]

**Claim 1: Eighth Amendment Cruel and Unusual Punishment, Excessive Force/Battery and Claim 5: Eighth Amendment Cruel and Unusual Punishment, Battery on Restrained Inmate (Plaintiff)**

On June 12, 2019, Plaintiff approached an officer in front of the 3B Yard clinic and asked to be protected for "life threats (safety concerns)." The officer secured Plaintiff until sergeants were informed. Around 7:04 a.m., Sergeant Hernandez arrived and asked Plaintiff to get dressed and follow him to his office. When Plaintiff entered the office, Sergeant Hubbard, Sergeant Hernandez, and an officer later identified as V. Cathey were present. Sergeant Hubbard asked Plaintiff to sit at the last chair close to his table, around eighteen feet from the door. Sergeant Hernandez's table was located to Plaintiff's right and V. Cathey was standing on Plaintiff's right side in front of Sergeant Hernandez's table.

Sergeant Hubbard started the interview and Sergeant Hernandez abruptly interrupted by asking Plaintiff to identify the trouble maker on his computer screen. While Plaintiff was doing so, Sergeant Hernandez swung open his baton and attempted to hit Plaintiff for no reason. Shortly after, Sergeant Hubbard ordered Plaintiff to get down. While Plaintiff was getting down, V. Cathey grabbed Plaintiff's right shoulder and punched his jaw, knocking him out without any warning. Plaintiff did not threaten, resist, or break any rules.

When Plaintiff woke up, he noticed that he was not on the same place where he was being interviewed and was now face down behind the office's door with his hands cuffed and leg restraints on his legs. V. Cathey was on top of Plaintiff putting pressure on his neck and body,

---

[1] The SAC also references several exhibits. However, no exhibits were attached to the SAC.

1    causing Plaintiff to experience shortness of breath and a lot of pain. Correctional Officers T. Wolf

2    and Huerta were pulling up and twisting the leg restraints, forcing the lowest part of Plaintiff's

3    body to twist to the left side. T. Wolf and Huerta started to punch Plaintiff's left ribs with force,

4    attempting to break them. The upper part of Plaintiff's body was trapped under Sergeant

5    Hernandez and Sergeant Hubbard, who were jumping and sitting on Plaintiff's back, and V.

6    Cathey who was on Plaintiff's neck. T. Wolf and Huerta released the leg restraints, and once

7    Plaintiff's legs were on the floor they started smashing Plaintiff's calves with their boots and

8    caused the leg restraints to close so abruptly it almost cut Plaintiff's skin through to the bone.

9    When the leg restraints were tightly closed, staff pulled the leg restraints up again. These actions

10   caused Plaintiff to faint. Plaintiff woke facing the floor still in handcuffs and leg restraints. He

11   was three or three-and-a-half feet away from where he was before.

12        Plaintiff heard Sergeant Hernandez order others to put Plaintiff back on his feet in a forced

13   bent position with his head pushed down. Sergeant Hernandez grabbed Plaintiff's head with two

14   hands, pushing it against the metal locker/cabinet with the help of V. Cathey and T. Wolf. The

15   force cut the left side of Plaintiff's forehead, damaged Plaintiff's nerves in his neck, caused

16   shoulder pain, and damaged Plaintiff's back.

17        Sergeant Hernandez then ordered T. Wolf and V. Cathey to throw Plaintiff in the program

18   office's metal cage. The two officers brought Plaintiff to the metal cage with his upper body bent

19   over, pushing Plaintiff's head down. T. Wolf and V. Cathey pushed Plaintiff hard into the back

20   wall of the metal cage, smashing his head against it.

21        During these events, Plaintiff did not resist, threaten the officers in any fashion, or break

22   any rules. V. Cathey, T. Wolf, and Huerta are members of the CSP-Corcoran Emergency

23   Response Team. V. Cathey, T. Wolf, Huerta, Sergeant Hernandez, and Sergeant Hubbard have

24   repeatedly engaged in excessive force against inmates in the past.

25        Plaintiff was in the hold cage without any medical emergency assistance. Plaintiff was

26   taken to the prison infirmary, where he did not receive treatment. Plaintiff was then taken to an

27   outside hospital, where his forehead skin was amputated and his neck, back, and shoulder were

28   evaluated. Plaintiff was taken by ambulance to the Bakersfield Adventist Health Hospital

1    emergency room. He was examined and damage was found. Plaintiff was then taken to A.S.U. for

2    no reason.

3          Plaintiff then describes his injuries resulting from various defendants' actions for

4    approximately three and a half pages.

5          Plaintiff is informed and believes that the CSP-Corcoran 3B Yard officials have a custom

6    of interference with inmates' rights to medical assistance, treatment, and services by not calling

7    emergency teams and not reporting the inmates' condition to medical staff. Plaintiff is also

8    informed and believes that CSP-Corcoran doctors and nurses turn down inmate requests, deny

9    medical needs, twist medical interviews to deny treatment, and falsify medical records by

10    following prison policy/custom. Further, Plaintiff is informed and believes that the 3B Yard

11    officials maintain a custom of using excessive force.

12          Plaintiff has witnessed Sergeant Hernandez and six-to-eight emergency response team

13    members using excessive force on inmates while they were restrained on two occasions. This

14    occurred at Plaintiff's cell door #113 and later in front of Plaintiff's cell door #114, all in front of

15    the floor officer's office. The first instance occurred around March or April of 2019, close to the

16    day Plaintiff arrived at CSP-Corcoran. It involved a building porter who was assaulted by another

17    inmate and was lying down facing the floor waiting to be cuffed up. A floor officer kicked his

18    legs and sprayed him. He offered no resistance and was facing down on the floor. Once he was

19    sprayed and restrained, the group of responding officers rushed into the building and kicked him

20    while he was restrained, followed by more pepper spray and assault by 2nd Watch staff.

21          The second instance occurred when an inmate was assaulted by four other inmate gang

22    members right in front of the 2nd Watch officers. The officers were sitting at the table at the front

23    of their office close to where the inmate was assaulted and did not activate the alarm until ten or

24    fifteen minutes passed, allowing the four inmates to assault the inmate. After activating the alarm,

25    they assaulted the victim by cuffing up his hands to his back, stepping on his neck, punching his

26    ribs, kicking his legs, and placing leg restraints on the victim's legs then twisting and pulling his

27    legs up to cause him to suffer horrible pain. These officers do it to cover up their abuses and to

28    blame the victim of resisting. None of the aggressors have been hurt by the officers.

1    Another inmate, Morales, said he was assaulted and restrained by Sergeant Hernandez and

2    was assaulted while Morales was not resisting and was proned out. Inmate Morales has witnessed

3    the unnecessary use of force that has been implemented by the 3B sergeant's supervisors and

4    executed by the yard sergeant Hernandez.

5    Plaintiff is informed and believes that the 3B Yard is run by Sergeant Hernandez and

6    Sergeant Hubbard's supervisors' custom of using unnecessary excessive force against anyone

7    who complains about safety concerns or the yard condition, snitches, child molesters, rapists, and

8    homosexual inmates they don't want in the yard.

9    Plaintiff is informed and believes that he was threatened to be stabbed by the 25vers gang

10   active members. These 25ver gang members are part of the 3B Yard officers' gang "CARS" and

11   are in charge of cleaning the yard of snitches or any other person they believe could be a threat to

12   their drug dealer interests.

13   Plaintiff is informed and believes that he was assaulted by the Sergeant Hernandez and

14   Sergeant Hubbard and their subordinates when he pointed out the one who threatened to stab him.

15   This inmate was a new arrival and within a month he was recruited into the yard CARS that work

16   with the 3B Yard officers.

17   Plaintiff is informed and believes that the 3B Yard officials, Sergeant Hernandez and

18   Sergeant Hubbard, have a custom of denying medical care to these victims of excessive force and

19   to those suffering from mental health issues.

20   **Claim 2: Eighth Amendment Cruel and Unusual Punishment, Assault and Battery**

21   On March 8, 2019, Plaintiff asked D.R.B. Director Kathleen Allison, who acts as a chair

22   person, to protect Plaintiff from being harmed by the 25ver gang. This gang has threatened to stab

23   Plaintiff. Knowing that Plaintiff has sought protection in the past for the same issues, Kathleen

24   Allison denied Plaintiff's request and with malice ordered prison officials to house Plaintiff with

25   enemies on the CSP-Corcoran 3B Yard, putting Plaintiff at risk. Defendant Allison knew that

26   Plaintiff had been labeled a snitch on S.N.Y. Gang affiliate yards. By placing him on those S.N.Y.

27   affiliates' yards, she knew his life would be at risk. Defendant Allison assaulted Plaintiff and

28   housed him on the risk yards.

1    Defendant Allison knew that CSP-Corcoran has a policy/custom of peace officer brutality
2    against any inmate who complains about prison conditions and safety concerns. Instead of
3    protecting Plaintiff from police brutality, she ordered CDCR officials to use excessive force on
4    Plaintiff. Around two months later, Plaintiff was assaulted.  Defendant Allison ordered CDCR
5    officials to use force on Plaintiff if he keeps "insisting on safety concerns." Knowing the risk,
6    Defendant Allison made the order to rehouse Plaintiff on a risk yard. Knowing the peace officers'
7    brutality, Defendant Allison ordered CDCR peace officers to batter Plaintiff.

8    Plaintiff was transferred to CSP-Corcoran 3B Yard and was presented at the ICC within
9    10 days. Plaintiff asked Captain Babb to protect him from 25vers active gang threats to stab him.
10   Plaintiff's request was denied.

11   Plaintiff returned to his cell quarter to avoid participating in exercise yard programs, but
12   Plaintiff was still threatened to be stabbed by the 25vers gang in the building's dayroom program.

13   On May 29, 2019, Plaintiff appeared at ICC and was housed on the same risk yard.
14   Plaintiff's request to be protected was denied and he was forced to be housed on 3B Yard.
15   Captain Babb explained that he followed D.R.B. orders and he would not provide any protection.
16   He asked his subordinate, Sergeant Hernandez, to take Plaintiff back to the building where he was
17   housed.

18   On June 12, 2019, Plaintiff went to the program office to ask to be protected. Once he was
19   in Sergeant Hernandez and Sergeant Hubbard's office, he was assaulted/battered by the officers
20   instead of protected. Shortly after these events, the two sergeants denied Plaintiff medical
21   emergency assistance for over forty-five minutes while Plaintiff was locked in a cage. Plaintiff
22   has been placed at A.S.U. without reason or notice.

23   Plaintiff's injuries from Kathleen Allison's actions include being housed in a risk yard,
24   suffering mental anguish and wanton pain, neck damage, low back disc damage, face
25   disfiguration, being kept in A.S.U. for close to two years, being prosecuted, being placed at a
26   super max security prison at risk to future harm, loss of sentenced time including "future lost of
27   260 days [soon as prosecution end]." Plaintiff's innocence does not "count" to CDCR, and they
28   found Plaintiff guilty on an offence with an RVR that they fabricated. Plaintiff's liberty interests

have been harmed.

**Claim 3: Eighth Amendment Cruel and Unusual Punishment, Battery and Assault**

The prison's wardens, Kern Klark and M. Gamboa, have been aware of constant use of excessive force grievances filed by inmates, especially at 3B Yard, where a custom has been implemented to batter inmates. Defendants have failed to correct the prison's brutality, have not supervised it, have harmed Plaintiff's physical appearance, have placed Plaintiff in A.S.U. for over or close to two years without reason, and have harmed Plaintiff's liberty interests by prosecuting him without reason and interfering with Plaintiff's release.

Prison wardens have allowed the 3B Yard officials and subordinates to implement the unnecessary use of excessive force and denial of medical care. They knew about the 3B Yard officers' cruelties and failed to supervise them by not correcting the problem and allowing the customs to continue.

Plaintiff's physical appearance has been disfigured, his prison time has been extended, he has experienced wanton pain, mental anguish, and his liberty interests have been harmed.

**Claim 4: Fourteenth Amendment Procedural Due Process**

On June 12, 2019, Plaintiff was assaulted by a group of 3B Yard officers and sent to the hospital. He was not "read any charges by the time he was told 'that you have a Right to have a lawyer,['] by the Prison I.S.U." Plaintiff returned from the hospital and was placed in A.S.U. without notice from any CDCR 114/115-D or any other document. Plaintiff was asked around June 14 or 15, 2019, if he wanted staff assistance to investigate an assault on a peace officer with a weapon. Plaintiff asked why he was placed in A.S.U. and did not receive an explanation from these officers. The officers punished Plaintiff by not providing him with a CDCR 114-D.

About seven or eight days later, on June 21, 2019, Plaintiff was taken to I.C.C. and once again was not told the charges. Captain Gamboa, Captain Gallagher, and Captain Campa told Plaintiff that he was secured at ad/seg for assault on a peace officer.

On July 3, 2019, Lieutenant Borrero and Sergeant Baraona conducted a video interview regarding the assault Plaintiff had suffered. They videotaped his injuries and bruises. Lieutenant Borrero and Sergeant Baraona explained that they didn't have a 7219 injuries report for the day of

1   June 12, 2019. They asked 4 AR Regular Nurse Ms. Flores to fabricate a 7219 because they did

2   not make one on June 12, 2019.

3          On July 23, 2019, Plaintiff was brought to the I.C.C. Once again, no charges were

4   explained to him. Plaintiff was told that, on June 21, 2019, they referred the case to the

5   prosecutor's office. Ten days after Plaintiff was notified that the case had been referred to the

6   District Attorney for possible prosecution, Plaintiff submitted a request to the CSP IGI office

7   asking for the complaint to find out the substance of the charges. The IGI stated that the case had

8   not been referred and that no complaint would be provided to Plaintiff.

9          On March 11, 2020, at Hanford Superior Court, Plaintiff's criminal lawyer provided

10  Plaintiff with the complaint. Plaintiff discovered that Captain Babb and Lieutenant T. Sanders

11  were responsible for the initial procedural due process violation. Captain Babb and T. Sanders

12  fabricated and falsified statements to be able to issue RVR 115 and place Plaintiff on A.S.U. and

13  to prosecute him without due process of law. Captain Babb and Lieutenant T. Sanders forged a

14  medical report 7219 by dating it June 12, 2019, and altered officers' reports to place Plaintiff in

15  ad/seg and to prosecute him. Plaintiff has not received notice regarding the ad/seg placement that

16  occurred on June 12, 2019, was not provided with information of the charges against him until

17  March 11, 2020, and was not notified of any prosecution initiation at all.

18         Plaintiff's injuries include close to two years in solitary confinement, increased parole

19  release date, three years at risk in a super max security prison, causing Plaintiff to be unable to

20  program and to be practically on continuing S.H.U. time, and being prosecuted with a possible

21  sentencing of more prison time knowing that he is innocent.

22  **Claim 6: Deliberate Indifference to Medical Care**

23         Plaintiff was assaulted and injured his back, neck, and face. He received cuts on his

24  forehead that were actively bleeding. On June 12, 2019, Sergeant Hubbard, Sergeant Hernandez,

25  Nurse Camacho Emilia, Nurse Boyd Donnie, Nurse Argon Lorena, Dr. Ramadan Amr., Gill

26  Ravijot, and T.T.A. Nurse Ibarra Jaime did not make any effort to provide emergency assistance

27  to Plaintiff or treat Plaintiff's injuries. Sergeant Hubbard and Sergeant Hernandez did not make

28  any effort to provide Plaintiff with medical emergency assistance after they inflicted the injuries

1  in their office. Plaintiff was bleeding extremely and in great pain asking for help. The Sergeants

2  did not call the medical emergency response team.

3       Sergeant Hernandez asked V. Cathey and T. Wolf to throw Plaintiff in the program

4  holding cage. Plaintiff was thrown with force in to the metal cage and the officers pushed

5  Plaintiff's head hard against the back wall of the cage. Plaintiff was screaming in pain and asked

6  to see the doctor, but the two Sergeants kept him in the metal cage without medical assistance for

7  over forty-five minutes. The Sergeants initially ordered V. Cathey and T. Wolf not to bring

8  Plaintiff to the 3B clinic. After forty to forty-five minutes, Sergeant Hubbard ordered T. Wolf and

9  V. Cathey to bring Plaintiff to the 3B clinic.

10      Once in the clinic, Sergeant Hubbard ordered Dr. Ramadan and all of the clinic nurses to

11  not make a 7219 injuries report or any other report that might compromise them. He made the

12  same order to J. Ibarra. Sergeant Hubbard's direct orders caused the doctors and nurses to not

13  provide emergency assistance to treat Plaintiff's injuries while he was at the 3B Clinic or at

14  T.T.A., where Dr. Gill Ravijot and Nurse Jaime Ibarra were in charge. Plaintiff's injury got

15  gangrene and he was forced to cut off some part of his forehead skin.

16      Defendants Camacho, Boyd, and Argon were at the 3B Yard clinic and did not provide

17  any treatment to Plaintiff for his injuries. These defendants also provided false medical reports to

18  the doctors was at the 3B Yard clinic. Defendant Ramadan, a doctor, was also present at the 3B

19  Yard clinic and did not offer any medical assistance or treatment and did not order the clinic

20  nurses to treat Plaintiff. To follow Sergeant Hubbard's orders, Defendant Ramadan recommended

21  sending Plaintiff to T.T.A where another doctor could make the decision. He failed his medical

22  duty to provide necessary treatment to Plaintiff's injuries and did not provide the T.T.A. doctor

23  and nurse sufficient information about the time and condition of the injuries.

24      Dr. Gill Ravijot was notified of Plaintiff's condition around 8:06 a.m. He stood in front of

25  the stretcher, saw the injuries, and walked out of the room. Dr. Ravijot kept Plaintiff at T.T.A. for

26  about two hours without treatment. In compliance with the Sergeant's orders, he sent Plaintiff to a

27  Bakersfield hospital instead of to the Corcoran hospital or any other hospital in Hanford. Dr. Gill

28  Ravijot did not act based on his own knowledge but based on the prison officials' custom. He

11

1    failed his medical duty and deprived Plaintiff of immediate medical assistance and treatment.

2    Plaintiff has suffered irreparable damages because of Dr. Ravijot transferring Plaintiff to a

3    Bakersfield hospital, which was a two-hour ride.

4         Nurse Ibarra Jaime arrived to the 3B clinic and was asked by Sergeant Hubbard not to

5    make any 7219 report that could compromise them. Nurse Ibarra Jaime did ask Plaintiff how the

6    injuries were inflicted and by who. Plaintiff explained the incident, but in compliance with the

7    Sergeant's orders, Nurse Ibarra did not make the 7219 injury report. Instead, he made a different

8    report with false statements. The T.T.A. Sergeant also asked this nurse to alter the injuries, and he

9    attempted to clean all of the blood on Plaintiff's face and fix the way the injury looked without

10   providing treatment. Plaintiff was taken to an outside hospital and, when he returned, Jaime Ibarra

11   asked the escort officer, Mrs. Rodriguez, to place Plaintiff in a cage without light. He acted as if

12   he was making the usual 7219 injury report that they used to make when a patient returns to

13   prison from the hospital. Nurse Ibarra acted based on the CDCR officials' custom and not based

14   on his own knowledge. He did not provide the necessary treatment and information to Dr. Gill or

15   the outside doctors regarding the time the incident occurred and the condition of the injuries. In

16   compliance with the Sergeant's order, he made a false report as to Plaintiff's condition. Due to

17   those actions, the Plaintiff had irreparable damages.

18        The Sergeant's actions denied Plaintiff assistance from the 3B medical emergency team.

19   The order for medical staff not to report anything that could compromise them deprived Plaintiff

20   of medical treatment from the doctors and nurses at CSP-Corcoran and caused the doctors and

21   nurses to falsify documents and statements. This interfered with Plaintiff's liberty interests.

22   Plaintiff did not receive treatment for his injuries at the Sergeant's office where the injuries were

23   inflicted because the Sergeants did not call the medical emergency team at all. None of the

24   doctors and nurses assisted Plaintiff within the CSP-Corcoran facility. Plaintiff's forehead skin

25   has been amputated by the outside hospital's doctor and Plaintiff is suffering irreparable damage

26   to his face and back. He still suffers neck nerve pain that is still untreated pursuant to the prison's

27   medical system custom. Plaintiff's injuries include disfiguration of his face, wanton pain and

28   suffering, interfering with Plaintiff's parole release day, irreparable back injury that still has not

1   been treated, and unknown future condition of Plaintiff's neck that has limited movement and has

2   not been treated.

3   **Legal Claims and Prayer for Relief**

4       The SAC sets forth a "Legal Claims" section listing claims against each defendant,

5   including violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual

6   punishment due to use of excessive force and denial of medical care, violation of Plaintiff's

7   Fourteenth Amendment procedural due process rights, negligence, assault, and battery.

8       Finally, the Prayer for Relief section then identifies Plaintiff's requested relief, including

9   declaratory and injunctive relief, compensatory damages, punitive damages, restoration of "all

10  Prison's [credit] time that has been [taken] Regarding R.V.R. 115 of 6/12/19" and "[t]o restore

11  the S.H.U. served time '2 years for one served' (Plaintiff serve close to two (2) years in false

12  [imprisonment]) he spend from 6/12/19 to October of 2020."

13  **III.   SECTION 1983**

14      The Civil Rights Act under which this action was filed provides:

15          Every person who, under color of any statute, ordinance, regulation,
            custom, or usage, of any State or Territory or the District of
16          Columbia, subjects, or causes to be subjected, any citizen of the
            United States or other person within the jurisdiction thereof to the
17          deprivation of any rights, privileges, or immunities secured by the
            Constitution and laws, shall be liable to the party injured in an action
18          at law, suit in equity, or other proper proceeding for redress....

19  42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely

20  provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490

21  U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979*)); see also*

22  *Chapman v. Houston Welfare Rights Org*., 441 U.S. 600, 618 (1979); *Hall v. City of Los Angeles*,

23  697 F.3d 1059, 1068 (9th Cir. 2012); *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012);

24  *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

25      To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under

26  color of state law, and (2) the defendant deprived him of rights secured by the Constitution or

27  federal law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *see also Marsh*

28  *v. Cnty. of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state

13

1    law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he

2    does an affirmative act, participates in another's affirmative act, or omits to perform an act which

3    he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler*

4    *II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*,

5    588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an

6    official sets in motion a 'series of acts by others which the actor knows or reasonably should

7    know would cause others to inflict' constitutional harms." *Preschooler II*, 479 F.3d at 1183

8    (quoting *Johnson*, 588 F.2d at 743). This standard of causation "closely resembles the standard

9    'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d

10   1350, 1355 (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.

11   2008).

12        Additionally, a plaintiff must demonstrate that each named defendant personally

13   participated in the deprivation of his rights. *Iqbal*, 556 U.S. at 676-77. In other words, there must

14   be an actual connection or link between the actions of the defendants and the deprivation alleged

15   to have been suffered by Plaintiff. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S.

16   658, 691, 695 (1978).

17        Supervisory personnel are generally not liable under § 1983 for the actions of their

18   employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a

19   supervisory position, the causal link between him and the claimed constitutional violation must be

20   specifically alleged. *Iqbal*, 556 U.S. at 676-77; *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.

21   1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). To state a claim for relief under

22   § 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would

23   support a claim that the supervisory defendants either personally participated in the alleged

24   deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or

25   promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of

26   constitutional rights' and is 'the moving force of the constitutional violation." *Hansen v. Black*,

27   885 F.2d 642, 646 (9th Cir. 1989) (citations and internal quotation marks omitted); *Taylor v. List*,

28   880 F.2d 1040, 1045 (9th Cir. 1989). For instance, a supervisor may be liable for his "own

1    culpable action or inaction in the training, supervision, or control of his subordinates," "his

2    acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that

3    showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*,

4    946 F.2d 630, 646 (9th Cir. 1991) (internal citations, quotation marks, and alterations omitted).

5    **IV.     ANALYSIS OF PLAINTIFF'S CLAIMS**

6         **A.     Excessive Force in Violation of the Eighth Amendment**

7         "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

8    restraints on prison officials, who may not … use excessive physical force against prisoners."

9    *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "[W]henever prison officials stand accused of

10   using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is

11   … whether force was applied in a good-faith effort to maintain or restore discipline, or

12   maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).

13        When determining whether the force was excessive, the Court looks to the "extent of

14   injury suffered by an inmate…, the need for application of force, the relationship between that

15   need and the amount of force used, the threat 'reasonably perceived by the responsible officials,'

16   and 'any efforts made to temper the severity of a forceful response.'"  *Hudson*, 503 U.S. at 7

17   (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).  While *de minimis* uses of physical force

18   generally do not implicate the Eighth Amendment, significant injury need not be evident in the

19   context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically

20   use force to cause harm, contemporary standards of decency always are violated."  *Hudson*, 503

21   U.S. at 9.

22        Here, Plaintiff alleges that he sought help from prison officials and, without warning or

23   provocation, Defendants Hernandez, Hubbard, Huerta, Cathey, and Wolf attacked him at the

24   sergeant's office. His allegations include that Defendant Cathey knocked Plaintiff out with a

25   punch, that Defendants Hernandez and Hubbard jumped on Plaintiff's back after he had been

26   knocked out, and that Defendants Huerta and Wolf twisted Plaintiff's leg restraints and punched

27   his ribs. Defendant Allison ordered the other Defendants to use force on Plaintiff.

28   ///

1    At this stage, Plaintiff has adequately alleged that the force used against him was applied

2    maliciously and sadistically to cause harm, not in a good-faith effort to maintain or restore

3    discipline. Thus, for screening purposes, the Court finds that Plaintiff has stated cognizable

4    claims against Defendants Hernandez, Hubbard, Huerta, Cathey, Wolf, and Allison for excessive

5    force in violation of the Eighth Amendment.

6    **B.    Deliberate Indifference to Serious Medical Needs**

7    "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate

8    must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091,

9    1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  This requires Plaintiff

10   to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition

11   could result in further significant injury or the unnecessary and wanton infliction of pain,'" and

12   (2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting

13   *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (citation and internal quotations

14   marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th

15   Cir. 1997) (*en banc*).

16   Deliberate indifference is established only where the defendant *subjectively* "knows of and

17   disregards an *excessive risk* to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057

18   (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted).  Deliberate

19   indifference can be established "by showing (a) a purposeful act or failure to respond to a

20   prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d

21   at 1096 (citation omitted).  Civil recklessness (failure "to act in the face of an unjustifiably high

22   risk of harm that is either known or so obvious that it should be known") is insufficient to

23   establish an Eighth Amendment violation.  *Farmer v. Brennan*, 511 U.S. 825, 836-37 & n.5

24   (1994) (citations omitted).

25   A difference of opinion between an inmate and prison medical personnel—or between

26   medical professionals—regarding appropriate medical diagnosis and treatment is not enough to

27   establish a deliberate indifference claim.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989);

28   *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).  Additionally, "a complaint that a

1   physician has been negligent in diagnosing or treating a medical condition does not state a valid

2   claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not

3   become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at

4   106.  To establish a difference of opinion rising to the level of deliberate indifference, a "plaintiff

5   must show that the course of treatment the doctors chose was medically unacceptable under the

6   circumstances." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

7          Here, Plaintiff alleges that Defendants Hernandez and Hubbard did not call for medical

8   treatment after the attack in the Sergeants' office. Defendant Hubbard instructed medical staff at

9   CSP-Corcoran not to make any 7219 injury reports or other reports that may "compromise" the

10   officers. Defendants Ravijot, Ibarra, Camacho, Argon, Ramadan, and Boyd saw the Plaintiff

11   while he was bleeding and in need of medical attention, that they failed to administer prompt

12   treatment or otherwise prevented Plaintiff from receiving prompt treatment, and that the lack of

13   timely treatment worsened the severity of his injuries. The Court finds that, for screening

14   purposes, Plaintiff has stated claims against Defendants Hernandez, Hubbard, Ravijot, Ibarra,

15   Camacho, Argon, Ramadan, and Boyd for deliberate indifference to serious medical needs in

16   violation of the Eighth Amendment.

17          **C.     Supervisory Liability**

18          As noted above, supervisory personnel are generally not liable under § 1983 for the

19   actions of their employees under a theory of *respondeat superior* and, therefore, when a named

20   defendant holds a supervisory position, the causal link between him and the claimed

21   constitutional violation must be specifically alleged. *Iqbal*, 556 U.S. at 676-77; *Fayle*, 607 F.2d at

22   862; *Mosher*, 589 F.2d at 441. A plaintiff must allege some facts that would support a claim that

23   the supervisory defendants either personally participated in the alleged deprivation of

24   constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or

25   "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights'

26   and is 'the moving force of the constitutional violation." *Hansen*, 885 F.2d at 646 (citations and

27   internal quotation marks omitted); *Taylor*, 880 F.2d at 1045.

28   ///

1    Plaintiff alleges that Defendants Gamboa, Klark, Babb, and Sanders had various levels of

2  supervisory authority over the 3B Yard and that they knew of a custom or policy of excessive

3  force and denial of medical care on that yard. Plaintiff alleges that there were other incidents of

4  excessive force on the yard, including by Defendant Hernandez. In addition, Plaintiff alleges that

5  there was a policy or custom of using excessive force and denying medical care to certain types of

6  inmates. However, Plaintiff does not allege that Defendants Gamboa, Klark, Babb, and Sanders

7  knew about those specific incidents or implemented those policies or customs. Instead, Plaintiff

8  alleges that the policies and customs were instituted by the sergeants on 3B yard.

9    Although Plaintiff alleges that Defendants Gamboa and Klark generally knew of the use

10  of excessive force and denial of medical care occurring on 3B Yard, these allegations are

11  conclusory and are not supported by any factual detail. To state a claim, a complaint must contain

12  sufficient factual detail for the Court to draw the reasonable conclusion that the defendant is liable

13  for the misconduct alleged. *Iqbal*, 556 U.S. at 678; *See also Krainskin v. Nev. Ex rel. Bd. Of*

14  *Regents of Nev. Sys. Of Higher Educ.,* 616 F.3d 963, 969 (9th Cir. 2010) (dismissing complaint

15  because plaintiff "merely alleged in a conclusory fashion that the officers 'knew or should have

16  known'" of the violation); *Buckley v. Cty. of San Mateo*, 2017 WL 3394747, at *2 (N.D. Cal.

17  Aug. 8, 2017) ("Supervisor defendants are entitled to qualified immunity where the allegations

18  against them are simply 'bald' or 'conclusory' because such allegations do not 'plausibly'

19  establish the supervisors' personal involvement in their subordinates' constitutional wrong."

20  (citing *Iqbal*, 556 U.S. at 675-84)); *Sullivan v. Biter,* 2017 WL 1540256, at *1 (E.D. Cal. Apr. 28,

21  2017) ("Conclusory allegations that various prison officials knew or should have known about

22  constitutional violations occurring against plaintiff simply because of their general supervisory

23  role are insufficient to state a claim under 42 U.S.C. § 1983.").

24    The Court therefore finds that the SAC does not state cognizable claims against

25  Defendants Gamboa, Klark, Babb, and Sanders on the basis of supervisory liability.

26    **D.    Failure to Protect**

27    "[P]rison officials have a duty … to protect prisoners from violence at the hands of other

28  prisoners." *Farmer*, 511 U.S. at 833. To establish a failure to protect claim, the prisoner must

1   establish that prison officials were deliberately indifferent to a sufficiently serious threat to the

2   prisoner's safety.  *Id*. at 837.  "'Deliberate indifference' has both subjective and objective

3   components."  *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013).  The prisoner

4   must show that "the official [knew] of and disregard[ed] an excessive risk to inmate ... safety; the

5   official must both be aware of facts from which the inference could be drawn that a substantial

6   risk of serious harm exists, and [the official] must also draw the inference."  *Farmer,* 511 U.S. at

7   837.  "Liability may follow only if a prison official 'knows that inmates face a substantial risk of

8   serious harm and disregards that risk by failing to take reasonable measures to abate it.'"

9   *Labatad,* 714 F.3d at 1160 (quoting *Farmer,* 511 U.S. at 847).

10        The Court notes that "[p]rison administration is a difficult and onerous task and courts

11   have traditionally accorded a large degree of deference in cases involving the administration of

12   state penal institutions." *Jimenez v. Diaz*, 2019 WL 5541372, at *4 (E.D. Cal. Oct. 28,

13   2019), *report and recommendation adopted*, 2020 WL 1911570 (E.D. Cal. Apr. 20, 2020)

14   (citation omitted); *see also Turner v. Safley*, 482 U.S. 78, 85 (1987) (noting that prison officials

15   are afforded widest latitude in cases involving the administration of state prisons). Accordingly,

16   courts grant prison officials substantial deference with respect to housing determinations. *Villery*

17   *v. California Dep't of Corr.*, 2020 WL 7651976, at *3 (E.D. Cal. Feb. 25, 2020).

18        Here, Plaintiff does not label any of his claims as failure-to-protect claims. However, the

19   SAC at various points indicates that Plaintiff requested protection and certain defendants failed to

20   protect him. Plaintiff alleges Defendants Allison and Babbs were aware of Plaintiff's safety

21   concerns on the 3B Yard. Specifically, Plaintiff alleges that he asked these Defendants to protect

22   him from threats of being stabbed by the 25ver gang and his requests were denied.

23        Plaintiff has not sufficiently alleged that Defendants Allison and Babbs put him in danger.

24   Although Plaintiff concludes that he was at risk on the 3B Yard, he does not allege that he was

25   actually injured by any 25ver gang members by being placed on the yard. The only allegations of

26   injury relate to the excessive use of force by prison staff, which have been analyzed separately.

27   Therefore, the Court finds that Plaintiff fails to state a failure to protect claim.

28   ///

1  **E.    Procedural Due Process**

2      A.    <u>General Procedural Due Process Legal Standards</u>

3      The Due Process Clause of the Fourteenth Amendment protects prisoners from being

4  deprived of life, liberty, or property without due process of law.  *Wolff v. McDonnell*, 418 U.S.

5  539, 556 (1974). "A due process claim is cognizable only if there is a recognized liberty or

6  property interest at stake." *Coakley v. Murphy*, 884 F.2d 1218, 1220 (9th Cir.1989). A liberty

7  interest may arise from the Constitution itself, or from an expectation or interest created by state

8  law or prison regulations. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Sandin v. Conner*,

9  515 U.S. 472, 483-84 (1995).

10      B. <u>Due Process Legal Standards Re: Administrative Segregation</u>

11      Prisoners do not have a liberty interest in remaining housed in the general prison

12  population. *Hernandez v. Constable*, 2020 WL 2145387, at *2 (E.D. Cal. Feb. 21, 2020), *report*

13  *and recommendation adopted*, 2020 WL 2126893 (E.D. Cal. May 5, 2020) (citing *Smith v*

14  *Noonan*, 992 F.3d 987, 989 (9th Cir. 1993); *McFarland v. Cassady*, 779 F.2d 1426, (9th Cir.

15  1986)). "Typically, administrative segregation in and of itself does not implicate a protected

16  liberty interest." *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003); *see also Sandin*, 515

17  U.S. at 486.

18      The U.S. Supreme Court, in determining if disciplinary proceedings resulting in 30 days

19  solitary confinement had to comply with Due Process, provided the following guidance for

20  determining when there is a deprivation of liberty interests such that procedural due process is

21  due in the prison context:

22      States may under certain circumstances create liberty interests which are protected
      by the Due Process Clause.  See also *Board of Pardons v. Allen,* 482 U.S. 369, 107
23      S.Ct. 2415, 96 L.Ed.2d 303 (1987).  But these interests will be generally limited to
      freedom from restraint which, while not exceeding the sentence in such an
24      unexpected manner as to give rise to protection by the Due Process Clause of its
      own force, see, *e.g., Vitek,* 445 U.S., at 493, 100 S.Ct., at 1263–1264 (transfer to
25      mental hospital), and *Washington,* 494 U.S., at 221–222, 110 S.Ct., at 1036–1037
      (involuntary administration of psychotropic drugs), nonetheless imposes atypical
26      and significant hardship on the inmate in relation to the ordinary incidents of prison
      life.
27

28

. . .

> We hold that Conner's discipline in segregated confinement did not present the
> type of atypical, significant deprivation in which a State might conceivably create
> a liberty interest.  The record shows that, at the time of Conner's punishment,
> disciplinary segregation, with insignificant exceptions, mirrored those conditions
> imposed upon inmates in administrative segregation and protective custody.  We
> note also that the State expunged Conner's disciplinary record with respect to the
> "high misconduct" charge nine months after Conner served time in segregation.
> Thus, Conner's confinement did not exceed similar, but totally discretionary,
> confinement in either duration or degree of restriction. Indeed, the conditions at
> Halawa involve significant amounts of "lockdown time" even for inmates in the
> general population.  Based on a comparison between inmates inside and outside
> disciplinary segregation, the State's actions in placing him there for 30 days did not
> work a major disruption in his environment.

*Sandin*, 515 U.S. at 483-87 (footnotes omitted).

Additionally, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 U.S. at 556. *Wolff* established five constitutionally mandated procedural requirements for disciplinary proceedings.  First, "written notice of the charges must be given to the disciplinary-action defendant in order to inform him of the charges and to enable him to marshal the facts and prepare a defense." *Id.* at 564.  Second, "at least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the [disciplinary committee]." *Id.*  Third, "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)).  Fourth, "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566. And fifth, "[w]here an illiterate inmate is involved [or] the complexity of the issue makes it unlikely that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or … to have adequate substitute aid … from the staff or from a[n] … inmate designated by the staff." *Id.* at 570.

1   However, "when prison officials initially determine whether a prisoner is to be segregated

2   for administrative reasons due process only requires the following procedures: Prison officials

3   must hold an informal nonadversary hearing within a reasonable time after the prisoner is

4   segregated.  The prison officials must inform the prisoner of the charges against the prisoner or

5   their reasons for considering segregation.  Prison officials must allow the prisoner to present his

6   views." *Toussaint v. McCarthy*, 801 F.2d 1080, 1100-01 (9th Cir. 1986) (footnote omitted),

7   *abrogated on other grounds, Sandin*, 515 U.S. 472.

8          C.      <u>Due Process Legal Standards Re: False Rules Violation Reports</u>

9         The filing of a false rules violation report by a prison official against a prisoner is not a

10   per se violation of the prisoner's constitutional rights. *See Muhammad v. Rubia*, 2010 WL

11   1260425, at *3 (N.D. Cal. Mar. 29, 2010), *aff'd*, 453 Fed. App'x 751 (9th Cir. 2011) ("[A]

12   prisoner has no constitutionally guaranteed immunity from being falsely or wrongly accused of

13   conduct which may result in the deprivation of a protected liberty interest. As long as a prisoner is

14   afforded procedural due process in the disciplinary hearing, allegations of a fabricated charge fail

15   to state a claim under § 1983.") (internal citation omitted.); *Harper v. Costa*, 2009 WL 1684599,

16   at *2–3 (E.D. Cal. June 16, 2009), *aff'd*, 393 Fed. Appx. 488 (9th Cir. 2010) ("Although the Ninth

17   Circuit has not directly addressed this issue in a published opinion, district courts throughout

18   California ... have determined that a prisoner's allegation that prison officials issued a false

19   disciplinary charge against him fails to state a cognizable claim for relief under § 1983.").

20         There are, however, two ways that allegations that an inmate has been subjected to a false

21   disciplinary report can state a cognizable civil rights claim: (1) when the prisoner alleges that the

22   false disciplinary report was filed in retaliation for her exercise of a constitutional right and (2)

23   when the prisoner alleges that she was not afforded procedural due process in a proceeding

24   concerning the false report. *See Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) ("[T]his court

25   has reaffirmed that prisoners may still base retaliation claims on harms that would not raise due

26   process concerns."); *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) (holding that the filing

27   of a false disciplinary charge against a prisoner is not actionable under § 1983 if prison officials

28   provide the prisoner with procedural due process protections); *Hanrahan v. Lane*, 747 F.2d 1137,

1140–41 (7th Cir. 1984) ("[A]n allegation that a prison guard planted false evidence which

implicates an inmate in a disciplinary infraction fails to state a claim for which relief can be granted where the procedural due process protections ....”); *see also Ellis v. Foulk*, No. 14–cv–0802 AC P, 2014 WL 4676530, at *2 (E.D. Cal. Sept. 18, 2014) (“Plaintiff’s protection from the arbitrary action of prison officials lies in ‘the procedural due process requirement[ ] ....’ ”) (quoting *Hanrahan*, 747 F.2d at 1140).

Additionally, in the criminal context and in the context of certain administrative proceedings, deliberately false allegations can give rise to a due process claim where there was a resulting deprivation of liberty.  *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (“[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.”); *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010) (denying summary judgment on a fabrication of evidence claim against a defendant based on evidence that the defendant falsified evidence that was used in an administrative proceeding, and which led to the revocation of Plaintiff’s foster care license and loss of guardianship of two minor children); *Chappell v. Bess*, 2012 WL 3276984, at *22 (E.D.  Cal. Aug. 9, 2012) (“The court finds that plaintiff has alleged the deprivation of a cognizable liberty interest based on his allegations that, as a result of defendants’ alleged fabrication of evidence, plaintiff was subjected to unwarranted disciplinary proceedings and criminal prosecution, and was retained in administrative segregation for more than two years, the latter, particularly if unwarranted, constituting an atypical and significant hardship ... in relation to the ordinary incidents of prison life.” (alteration in original) (citation and internal quotation marks omitted)).

“To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff’s deprivation of liberty. To establish the second element of causation, the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the ‘proximate cause’ or ‘legal cause’ of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question.”  *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir.

1   2017) (citations omitted).  In addition, a plaintiff must wait until the criminal case finishes before

2   bringing the action. *McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019) (holding an acquitted

3   plaintiff "could not bring his fabricated-evidence claim under § 1983 prior to favorable

4   termination of his prosecution").[2]

5           D.      Analysis

6           Here, Plaintiff asserts a Fourteenth Amendment procedural due process claim against

7   Defendants Gamboa, Sanders, Babb, and Gallegher. Plaintiff alleges that he was placed in

8   administrative segregation without being provided a CDCR 114-D or other notice of the charges

9   against him. Plaintiff also alleges that Captain Babb and T. Sanders fabricated and falsified

10  statements to be able to issue RVR 115 and place Plaintiff in administrative segregation and to

11  prosecute him without due process of law.

12          The Court finds that Plaintiff's allegations regarding his placement in administrative

13  segregation due not state a cognizable due process claim. Plaintiff does not allege any facts

14  pertaining to his disciplinary hearing or any violations of the procedural requirements for

15  disciplinary hearings under *Wolff*. As noted above, under *Toussaint,* segregation for

16  administrative reasons only requires prison officials to hold a non-adversarial hearing within a

17  reasonable time, to inform the prisoner of the charges or reasons for considering segregation, and

18  to allow the prisoner to present his views. Here, Plaintiff alleges that his due process rights were

19  infringed because he did not receive a CDCR Form 114 and was not notified of the charges

20  against him when placed in administrative segregation. However, Plaintiff also alleges that,

21  approximately two or three days after he returned from the hospital and was placed in

22  administrative segregation, he was asked if he wanted staff assistance to investigate an assault on

23  a peace officer with a weapon. Approximately seven or eight days later, on June 21, 2019,

24

25  [2] While neither the Ninth Circuit nor Supreme Court have clearly addressed it, it is likely that the criminal case must
    end in a plaintiff's favor. In *McDonough*, the Supreme Court suggested without holding that was a requirement. *See*

26  *id.* at 2156, 2160 ("As already explained, McDonough's claim remains most analogous to a claim of common-law
    malicious prosecution, even if the two are not identical. *Heck* explains why favorable termination is both relevant and
    required for a claim analogous to malicious prosecution that would impugn a conviction, and that rationale extends to

27  an ongoing prosecution as well: The alternative would impermissibly risk parallel litigation and conflicting
    judgments. If the date of the favorable termination was relevant in *Heck*, it is relevant here." (citations omitted)). But
    the Supreme Court noted it was *not* deciding the contours of a fabricated evidence claim. *See id.* at 2155 n.2. It

28  appears the Ninth Circuit has not squarely addressed the issue.

1    Plaintiff was taken to I.C.C. and Defendants Gamboa and Gallagher, along with Captain Campa,

2    told Plaintiff that he was secured in administrative segregation for assault on a peace officer.

3    Thus, Plaintiff alleges that he was, in fact, notified of the charges against him shortly after being

4    placed in administrative segregation. Instead, Plaintiff's due process claim is premised on prison

5    officials' failure to explain the factual basis for the charges against him. However, *Wolff* and

6    *Toussaint* do not require prison officials to provide notice on a particular form or to explain the

7    factual bases for any charges upon placement in administrative segregation.  Therefore, Plaintiff

8    has failed to allege a procedural due process violation arising out of his placement in

9    administrative segregation.

10           Plaintiff's allegations that Captain Babb and T. Sanders fabricated and falsified statements

11    against him also do not amount to a cognizable constitutional violation. Plaintiff can state a

12    constitutional claim only if (1) the false allegations were made in retaliation for Plaintiff

13    exercising his constitutional rights, (2) he was not afforded procedural due process in a

14    proceeding concerning the false report, or (3) the false statement was used to subject Plaintiff to a

15    criminal proceeding in accordance with *Devereaux*.

16           The SAC does not allege that Captain Babb and T. Sanders created the false rules

17    violation report in retaliation for exercising a constitutional right. Instead, Plaintiff alleges that he

18    was not afforded procedural due process in a proceeding concerning the false report. Specifically,

19    the SAC alleges that Plaintiff was not informed of the criminal charges against him and was not

20    told that criminal prosecution had been initiated. However, as noted above, the facts alleged in the

21    SAC establish that Plaintiff was notified of the charges against him and Plaintiff's due process

22    claim is actually based upon a failure to explain the underlying facts for those charges, which

23    does not state a cognizable procedural process claim. Plaintiff further alleges that he was told that

24    the case had been referred to the prosecutor's office on July 23, 2019, and Plaintiff's criminal

25    lawyer provided him with the complaint on March 11, 2020. According to the SAC, the criminal

26    proceedings are still ongoing. The facts alleged in the SAC accordingly do not support Plaintiff's

27    statements that he was not notified of the criminal charges against him or of the initiation of

28    prosecution.

1    Additionally, because the SAC alleges that the criminal proceedings arising out of the

2    false rules violation report have not ended in his favor, Plaintiff fails to adequately allege a

3    *Devereaux* deliberate fabrication claim.

4    Finally, although the SAC does not allege any procedural defects in connection with a

5    disciplinary hearing as noted above, Plaintiff requests restoration of "all Prison's [credit]  time

6    that has been [taken] Regarding R.V.R. 115 of 6/12/19."  Challenges to disciplinary proceedings

7    that result in the loss of good time credits,[3] and necessarily affect the duration of an inmate's

8    sentence, must be filed as a writ of habeas corpus (subject to exhaustion and other requirements

9    for such petitions), rather than a § 1983 action. *See Edwards v. Balisok*, 520 U.S. 641, 646 (1987)

10   (§ 1983 claim not cognizable because allegations of procedural defects and a biased hearing

11   officer implied the invalidity of the underlying prison disciplinary sanction of loss of good-

12   time credits); *cf. Ramirez v. Galaza*, 334 F.3d 850, 858 (9th. Cir. 2003) (holding that the

13   favorable termination rule of *Heck* and *Edwards* does not apply to challenges to prison

14   disciplinary hearings where the administrative sanction imposed *does not* affect the overall length

15   of confinement and, thus, does not go to the heart of habeas); *see also Wilkerson v. Wheeler*, 772

16   F.3d 834 (9th Cir. 2014) (discussing loss of good-time credits); *Nettles v. Grounds*, 830 F.3d 922,

17   934–35 (9th Cir. 2016) (discussing the impact of a prison disciplinary violations in determining

18   suitability for parole).

19   In light of the foregoing, the Court finds that Plaintiff fails to state cognizable claims for

20   violation of Plaintiff's Fourteenth Amendment procedural due process rights.

21       **F.**      **False Injury Reports**

22   As noted above, filing false allegations by itself does not violate a prisoner's

23   constitutional rights so long as (1) the prisoner receives procedural due process before there is a

24   deprivation of liberty as a result of false allegations, and (2) the false allegations are not in

25   retaliation for the prisoner exercising constitutional rights.  *Hackworth v. Arevalos*, 2020 WL

26   8834886, at *4 (E.D. Cal. June 29, 2020) (citing *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir.

27   _____

28   [3] A loss of good time credits might not affect the duration of Plaintiffs sentence if he was facing an indeterminate sentence of life without possibility of parole, but there are no indications this is the case.

1  1997), and *Hanrahan v. Lane*, 747 F.2d 1137, 1140-41 (7th Cir. 1984)); *Harper*, 2009 WL

2  1684599, at *2–3.

3        Plaintiff alleges that Defendants Ibarra, Camacho, Argon, and Boyd failed to truthfully fill

4  out required forms about Plaintiff's injury and provided false medical reports to Plaintiff's

5  doctors. Plaintiff does not allege that he was deprived of any liberty interest in connection with

6  the false reports. For instance, he does not allege that he was sent to solitary confinement or

7  received any punishment based on the injury reports. Plaintiff also does not allege that the false

8  allegations were in retaliation for exercising his constitutional rights; rather, he alleges that the

9  false reports were written to protect prison staff from repercussions. Therefore, the Court finds

10  that Plaintiff does not state a claim for violation of his constitutional rights based on the false

11  injury reports.

12        **G.    State Law Claims**

13        California's Government Claims Act[4] requires that a claim against the State[5] or its

14  employees "relating to a cause of action for death or for injury to person" be presented to the

15  California Victim Compensation and Government Claims Board, formerly known as the State

16  Board of Control, no more than six months after the cause of action accrues. Cal. Gov't Code §§

17  905.2, 910, 911.2, 945.4, 950-950.2. Presentation of a written claim, and action on or rejection of

18  the claim, are conditions precedent to suit. *State v. Superior Court of Kings County (Bodde)*, 32

19  Cal.4th 1234, 1245 (Cal. 2004); *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1477

20  (9th Cir. 1995). To state a tort claim against a public entity or employee, a plaintiff must allege

21  compliance with the Government Claims Act. *Bodde*, 32 Cal.4th at 1245; *Mangold*, 67 F.3d at

22  1477; *Karim-Panahi v. Los Angeles Police Dept*., 839 F.2d 621, 627 (9th Cir. 1988).

23        Plaintiff alleges state law claims for negligence, assault, and battery against various

24  defendants. However, Plaintiff does not allege he complied with the Government Claims Act.

25  _____

26  [4] This Act was formerly known as the California Tort Claims Act. *City of Stockton v. Superior Court*, 42 Cal. 4th
    730, 741-42 (Cal. 2007) (adopting the practice of using Government Claims Act rather than California Tort Claims

27  Act).

28  [5] " 'State' means the State and any office, officer, department, division, bureau, board, commission or agency of the
    State claims against which are paid by warrants drawn by the Controller." Cal. Gov't Code § 900.6.

1    Therefore, the Court finds that the SAC fails to state claims for negligence, assault, and battery.

2    **V.      CONCLUSION, RECOMMENDATIONS, AND ORDER**

3            The Court has screened Plaintiff's Second Amended Complaint and finds that Plaintiff's

4    claims against Defendants Hernandez, Hubbard, Huerta, Cathey, Wolf, and Allison for excessive

5    force in violation of the Eighth Amendment and against Defendants Hernandez, Hubbard,

6    Ravijot, Ibarra, Camacho, Argon, Ramadan, and Boyd for deliberate indifference to serious

7    medical needs in violation of the Eighth Amendment should proceed past screening.[6]  The Court

8    also finds that all other claims and defendants should be dismissed.

9            The Court previously explained to Plaintiff the deficiencies in his complaint, provided

10   Plaintiff with relevant legal standards, and provided Plaintiff an opportunity to amend his

11   complaint.  As Plaintiff filed his Second Amended Complaint with the benefit of the information

12   provided by the Court, it appears that further leave to amend would be futile.

             Accordingly, based on the foregoing, it is HEREBY RECOMMENDED that:

13       1.  This case proceed on Plaintiff's claims against Defendants Hernandez, Hubbard,

14           Huerta, Cathey, Wolf, and Allison for excessive force in violation of the Eighth

15           Amendment and against Defendants Hernandez, Hubbard, Ravijot, Ibarra, Camacho,

16           Argon, Ramadan, and Boyd for deliberate indifference to serious medical needs in

17           violation of the Eighth Amendment;

18       2.  All other claims and defendants be dismissed for failure to state a claim upon which

19           relief may be granted; and

20       3.  The Clerk of Court be directed to terminate M. Gamboa, Kern Klark, Babb, and A.

21           Arisco as defendants on the docket and to add Kathleen Allison, Gill Ravijot, Ibarra

22           Jaime, Camacho Emilia, Argon Lorena, Ramadan Amr., and Boyd Donnie as

23           defendants on the docket.

24           These findings and recommendations will be submitted to the United States district judge

25   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within twenty-one

26

27   [6] As discussed above, the TAC alleges that criminal charges are pending against Plaintiff but the nature and
     circumstances of these charges are unclear. Plaintiff's claims may be barred or subject to stay to the extent they are
28   the subject of a pending criminal proceeding. Defendants, once they are served, may file any appropriate motions if
     they choose.

(21) days after being served with these findings and recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

Additionally, IT IS ORDERED that the Clerk of Court is directed to assign a district judge to this case.

IT IS SO ORDERED.

Dated:   **July 23, 2021**                        /s/ *Erica P. Grosjean*
                                                  UNITED STATES MAGISTRATE JUDGE

29